IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TIMOTHY PETTWAY,**                                   Case Number 1:14 CV 562

      Petitioner,                                        Judge Lesley Wells

      v.                                                 Magistrate Judge James R. Knepp, II

**MARK HOOKS, WARDEN**[1]

      Respondent.                                        REPORT AND RECOMENDATION

### INTRODUCTION

Petitioner Timothy Pettway, a prisoner in state custody, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. 1). Respondent Warden Mark Hooks filed a Return of Writ (Doc. 8) with attached exhibits, and Petitioner filed a Traverse[2] (Doc. 9). The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated March 14, 2014). For the reasons discussed below, the undersigned recommends the Petition be denied.

### FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, that the state court's factual findings were erroneous. §

---

1. Pettway is currently incarcerated at Ross Correctional Institution, not Toledo Correctional Institution. As such, Mark Hooks, the Warden of Ross Correctional Institution, is the proper Respondent pursuant to Federal Rule of Civil Procedure 25. *Rumsfeld v. Padilla*, 542 U.S. 426, 434-35 (2004).
2. Traverse is now termed a Reply. *See* Advisory Committee Notes (1976) to Rule 5 of Rules Governing Section 2254.

2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524,

530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state

court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530. Ohio's Eighth

District Court of Appeals set forth the following findings of fact:

> Elizabeth Wilson testified that she became friends with the victim, Christopher Mitchell, in 2006 while they were both students at Tri-C. Wilson introduced her friend, Jillian Emenhiser, to Mitchell. They would all hang out together at Mitchell's apartment.
>
> Wilson began dating Pettway in January 2007. She also introduced him to Mitchell sometime around February that same year. On the afternoon of June 17, 2007, she received a text message from Pettway saying that he was going to move into Mitchell's spare bedroom. Later that evening, after Wilson and Emenhiser got off work, they went to Mitchell's apartment. Pettway was there, cleaning the spare bedroom. Mitchell was not home when they got there, but he arrived around 3:00 or 4:00 a.m. with his girlfriend, Rebecca Beyer. When Mitchell arrived, he was angry with Wilson and Emenhiser for smoking in his apartment. He told them that they had to go outside to smoke. They did, and Mitchell followed them outside and kissed both of them on the mouth. Wilson said that she was not offended, but she thought it was strange. Emenhiser told Mitchell to stop. They went back in the apartment and went to bed. Wilson said she told Pettway about the kiss when they went to bed.
>
> Emenhiser slept on the couch. When she woke up, she said Mitchell was playing music very loudly, and he was taking the locks off of the door in the spare bedroom, which Pettway had put on. Emenhiser asked him why, and he said he was mad that they had smoked in his apartment and said that he did not think he could get along with Pettway.
>
> Wilson testified that she woke up when she heard Mitchell taking the locks off of the door. She said Mitchell was using a screwdriver to remove the locks. Pettway got up, packed some of his belongings in suitcases, and left with Wilson and Emenhiser. They took a cab to a bookstore in Bay Village. Pettway took his suitcases into the bookstore. Wilson went in to change her clothes, but Emenhiser remained in the cab. Lisa Flaatrud, the owner of the bookstore, confirmed Wilson's and Emenhiser's testimony regarding this portion of the events.
>
> Pettway, Wilson, and Emenhiser left the bookstore in the cab and went to Pettway's aunt's house on West 104th Street. While they were there, Pettway asked Wilson and Emenhiser to go back to Mitchell's with him to get the rest of his belongings. Neither woman wanted to go, so Pettway

called a friend of his, whom he called "Smoke." Wilson identified Smoke as codefendant Joseph McGowan.

McGowan testified that he pled guilty in this case to aggravated murder and aggravated robbery and was serving a sentence of 25 years to life in prison in exchange for giving truthful and honest testimony. He said that on June 18, 2007, Pettway called him and asked him to help him move his things out of Mitchell's apartment. McGowan met Pettway at Mitchell's apartment. Mitchell and his girlfriend were there. Pettway told McGowan to take some bags from the kitchen and living room downstairs and place them in the cab when it arrived.

McGowan said when he got back to Mitchell's apartment and after making two trips downstairs, Pettway closed the door to the kitchen and "tossed [him] a [baseball] bat." Next, Pettway "shut the blinds," and McGowan "heard a gun cock and [Mitchell] stood up and took the phone off his ear." Pettway said to Mitchell's girlfriend, "this ain't got nothing to do with you girl." Then, [Mitchell] and Pettway began to wrestle. While wrestling, McGowan said that Pettway shot Mitchell. After Pettway shot Mitchell, McGowan heard him say, "why [are] you messing with my girl?"

McGowan further testified that after Pettway shot Mitchell, Pettway told him to go in the kitchen and "hit that nigger." McGowan said he hit Mitchell twice in the leg with the bat. He said he listened to Pettway because Pettway had a gun and he "fear[ed] for his life." Then, McGowan said Pettway took the baseball bat from him and hit Mitchell in the head with it three or four times. Mitchell was lying on the floor on his stomach, "moaning and groaning" as Pettway hit him. The bat was made of wood and had duct tape around it.

McGowan also testified that Pettway took some property from the living room, including an "XBOX, laptop, [and] other things," but that Pettway claimed the items belonged to him.

McGowan put the bags in the cab when it arrived. As he was moving the bags, he noticed Pettway had the baseball bat in his hand and a bag on his shoulders. McGowan heard Pettway tell the cab driver to go to West 104th Street and Western Avenue. When they got there, McGowan helped unload the items from the cab. Several other people from in the house also helped. McGowan said he traded shoes with Pettway in the basement and left after the bags were unloaded because the incident and Pettway made him feel "unsafe."

Wilson testified that when Pettway returned to Loida Arroya's house, Pettway's aunt, he was sweating and seemed rattled. Emenhiser said she heard Pettway tell Wilson that he had to shoot Mitchell. Emenhiser said she also overheard Pettway telling McGowan as they unloaded the cab that they had to "take their clothes off." Emenhiser testified that Pettway went to

Arroya's basement and changed his clothes. Wilson, however, denied that Pettway changed his clothes. Wilson further testified that Pettway did not tell her anything that had happened while they were still at Arroya's house.

After McGowan left Arroya's, Wilson, Emenhiser, and Pettway went to Pettway's friend's house down the street. They were watching television when they saw Mitchell's apartment building on the news and heard that a male had been shot and killed. Wilson said she recognized that it was Mitchell's apartment building. Wilson and Emenhiser went to the bathroom together to talk about what might have happened. Wilson said she was upset and thought it might have been Mitchell who was killed. Wilson said they were in the bathroom for about an hour because she just learned her friend was dead and she was trying to deal with it. Both women were crying. Pettway came into the bathroom and told Wilson not to be mad.

Emenhiser said that Pettway told her that he was arguing with Mitchell and when he went to kick Mitchell, Mitchell grabbed his leg, and Pettway fell back and accidentally shot Mitchell.

The day after the murder, June 19, Wilson said she and Pettway were in the car when she asked Pettway what happened at Mitchell's apartment. Pettway told her he "had to shoot him." She said Pettway told her that while he was arguing with Mitchell, he tried to kick Mitchell away from him, but Mitchell grabbed his foot. Pettway then told Wilson that he fell backwards and when he hit the ground, his gun went off and the bullet hit Mitchell. Wilson testified that Pettway told her McGowan began hitting Mitchell with the baseball bat; Pettway said he told him to stop twice, but McGowan continued to hit Mitchell.

Wilson asked Pettway to take her home and he did. She did not call the police. The police came to her house a couple of days later and asked her questions about Mitchell's murder. After she told the police what she knew, she told Pettway that the police had contacted her. At that point, Wilson said that Pettway "elaborated on what he had told [her] before that." Pettway told her that "[Mitchell] like came at him with the screwdriver" up "by his neck," and that they both tried to grab the gun and were struggling over it when it went off. Wilson said the first time she heard about a screwdriver was the second time they discussed what happened.

Wilson further said that she and Pettway discussed what happened a third time, about a week later, at his uncle's house. This time, Wilson said Pettway told her that he was arguing with Mitchell in the bedroom and the gun was on the bed. Pettway said Mitchell swung at him with a screwdriver, "[t]hey struggled for the gun and[,] somehow he shot [Mitchell]." When she went home, she told the police where Pettway was and they picked him up there. Wilson admitted that she lied to police that Pettway told her, "someone had gotten rid of the gun for him." She said she only told the police so that she could go home.

4

Emenhiser said she also spoke to Pettway again about Mitchell's death at her home, a few days later. This time, Pettway told her "him and [Mitchell] were arguing and that [Mitchell] went to grab a screwdriver and came after him with a screwdriver and that he shot him. " Emenhiser said she also talked with Pettway a third time about what happened. Emenhiser said she spoke to the police before she went to talk to Pettway for the third time, and that Wilson knew she spoke to the police. This time, Pettway repeated what he said to her the second time (at her house), but he added that McGowan hit Mitchell with a baseball bat several times. Pettway told her that he kept telling McGowan to stop. This was Pettway's first time mentioning to Emenhiser that a bat was involved. Emenhiser said Pettway wanted to know what she told the police and he asked her not to testify against him.

Jasmine Rowe testified that she lived in the same apartment complex as Mitchell in June 2007. They were close friends; she had known him for about eight months and visited his apartment daily. On June 18, 2007, she heard something that "sounded like a door slam and then [she] heard footsteps in the stairway." She went outside to smoke and saw two men taking boxes from Mitchell's apartment and putting them in a cab. Rowe identified Pettway as one of the men taking the boxes into the cab. She did not see the men get into the cab, but she saw the cab leave. As Rowe walked toward Mitchell's apartment, she saw Beyer, Mitchell's girlfriend. Beyer looked upset, and Rowe let her use her cell phone. After Rowe saw that Beyer called 911, she went into Mitchell's apartment and saw him lying on the floor with blood coming from his head; he was not moving, and he did not appear to be breathing. Rowe waited outside of the apartment until the authorities arrived.

Augustine Cooper, a cab driver, testified that at 3:45 p.m. on June 18, 2007, he responded to a call for a pickup on West 44th Street and Bridge Avenue (Mitchell's apartment). Two men loaded the van with milk crates, bags, and a suitcase. The passengers were not hurrying as they loaded the cab. Cooper said as the men got into the cab, he saw an object wrapped in duct tape, which he believed to be a wooden hockey stick. Both Pettway and the other passenger handled this object.

Loida Arroya testified that on June 18, 2007, Pettway and another person came to her house and unloaded items from a cab. Wilson and Emenhiser were already at her house and they helped unload the cab. After that, she noticed Pettway and the other passenger changed their clothes. She also said Pettway was not acting normal when she saw him, he was in a hurry, and he tried to leave as quickly as possible. They all left soon after that. The police arrived at Arroya's home a couple of hours later, searched the home, and took several of Pettway's items, including clothing, some shoes, and a laptop.

Officer Donny Bettis testified that he and his partner were the first to arrive at Mitchell's apartment. Officer Bettis said there was a female at the crime scene who was "fearful, scared, nervous, [and] shaken up." Officer Bettis obtained the name of a suspect, a physical description, and Arroya's address. Officer Bettis and other officers went to Arroya's home on West 104th Street. The suspect was not there, but the officers spoke to Arroya.

Officer Preston Manney testified that when he and his partner arrived at the scene, there were "several other zone cars * * * arriving." Officer Manney stated that they arrived approximately five minutes after Mitchell had been shot; he appeared to be dead when they got there. Other than Mitchell, Beyer was the only other person in the apartment. He said that Beyer "was rather shook up, but not hysterical. She pretty much was calm enough to answer our questions without going into hysterics." Officer Manney could tell that she was upset because she "had been crying, there were tears, stress in her voice, she was very excitable." When asked, "what caused her to be so upset," Officer Manney replied, "[t]he male being shot and then stomped on."

Officer Manney testified, "[w]hen we asked [Beyer] how long it had been, she stated that it just happened, that he was moving a few minutes before we arrived." He further testified, "[s]he told us that a male that had moved in yesterday and was told to move out had returned with a friend. When they came into the apartment, the male that had moved in, suspect number one, produced a revolver, a gun actually she said."

Officer Manney further stated that, "[w]e learned of a vehicle through a second witness who was downstairs." He also testified that he learned (but did not say from who) that the suspect was a black male, about 5 feet ten or eleven inches tall, and that he had left the "premises" approximately five to ten minutes before they got there in a "Zone cab."

Detective Kathleen Carlin testified that when she arrived at the scene, she learned a cab was used to transport the suspects. She contacted the cab company and asked them to bring the cab back to the scene of the crime. When the cab arrived, she interviewed Cooper, learned where he took the passengers, and had the cab towed so it could be examined.

When the SIU (Scientific Investigation Unit) arrived, Detective Carlin had them take pictures of the apartment. She stated the apartment was "fairly neat and organized," there appeared to be items missing from the entertainment center, and there was a screwdriver next to Mitchell. She spoke to Rowe and Beyer at the scene and had them give statements. Rowe and Beyer gave descriptions of two suspects. The next day, Detective Carlin went to Arroya's house, spoke with her, searched the basement, and found a laptop computer, two pairs of boots, and a Tshirt.

6

> Doctor Andrea McCollom, deputy coroner for the Cuyahoga County
> Coroner's Office, testified that Mitchell died as a result of "[b]lunt impacts
> to the head with skull and brain injuries" and from a gunshot wound to the
> upper abdomen. She further testified that either "condition" could have
> killed him.

(Doc. 8-1, Ex. 8 at 84-94). Petitioner alleged these facts are incorrect because they rely on the testimony of Joseph McGowan, who has since recanted his statement; however, he has not proven by clear and convincing evidence this recitation is incorrect, and thus, the Eighth District's factual statement will stand. (*See* Doc. 9, at 2).

## PROCEDURAL BACKGROUND

The procedural history was not disputed by the Petitioner and was accurately summarized in Respondent's brief; therefore it is incorporated herein with only minor changes. (Doc. 8, at 7-17).

### State Trial Court

On July 10, 2007, the Cuyahoga County, Ohio Grand Jury indicted Pettway on two counts of Aggravated Murder in violation of R.C. § 2903.01(A) and (B), each count included two firearm and three felony murder specifications; two counts of Aggravated Robbery in violation of R.C. § 2911.01(A)(1) and (3), each count included two firearm specifications; two counts of Aggravated Burglary in violation of R.C. § 2911.11(A)(1) and (2), each count included two firearm specifications; and one count of kidnapping in violation of R.C. § 2905.01(A)(1-3), including two firearm specifications. (Doc. 8-1, Ex. 1). Petitioner, represented by counsel, entered a not guilty plea to all of the charges. (Doc. 8-1, Ex. 2).

Following the Ohio Supreme Court's decision in *State v. Colon*, 2008-Ohio-1624, the court entered a *nolle prosequi* on Counts 4 (Aggravated Robbery) and 5 (Aggravated Burglary), upon the state's request, and case proceeded to jury trial on the remaining counts on May 5, 2008. (Doc.8-1, Ex. 3). Petitioner was found guilty of the lesser included offense of Murder and

all specifications under Count 1, and was sentenced to fifteen years to life for the conviction of Murder, with a consecutive three years for the merged firearm specifications, for an aggregate prison term of eighteen years to life. (Doc. 8-1, Ex. 4).

***Direct Appeal***

On June 27, 2008, Petitioner filed a timely notice of appeal in the Eighth District Court of Appeals, Cuyahoga County, Ohio. (Doc. 8-1, Ex. 5). In his brief, he raised the following assignments of error:

1. The trial court erred in allowing the testimony of Jillian Emenhiser where her name was not disclosed to Appellant in the State's discovery response.

2. The trial court erred in denying Appellant's Criminal Rule 29 Motion for Acquittal when there was insufficient evidence to prove the elements of Murder.

3. The Appellant's conviction for murder was against the manifest weight of the evidence.

4. The trial court erred in admitting the hearsay statement of Rebecca Beyer into evidence.

5. Appellant's conviction for murder must be reversed where there was more than once cause of death and he was not the principal offender.

(Doc.8-1, Ex. 6). The State of Ohio filed a brief in response. (Doc. 8-1, Ex 7). In an opinion filed September 14, 2009, the Eighth District Court of Appeals overruled Petitioner's assignments of error and affirmed the judgment of the trial court. (Doc. 8-1, Ex 8). Petitioner failed to perfect a timely appeal from this decision, thus, his conviction became final October 29, 2009.

***Collateral Actions***

Rather than appropriately pursuing his instant record claims in a timely direct appeal, Petitioner has spent the past five years in the unsuccessful pursuit of collateral actions in the state courts. His first unsuccessful post-conviction proceeding appears to be the genesis for his instant habeas grounds for relief.

*First Post-Conviction Petition*

On January 27, 2009, Pettway filed his first *pro se* post-conviction petition setting forth

the following six errors:

1. The State's only "eye witness" to testify at trial was (co-defendant) Joseph McGowan, who is now recanting his testimony. The Petitioner's conviction was based on the perjured testimony of McGowan who claimed to witness Petitioner assault the victim and then went on to allege the Petitioner encouraged and/or caused the death of the victim. Furthermore, there were variances between McGowan's testimony during trial and his prior statement to the Cleveland police. McGowan now submits an Affidavit recanting his trial testimony that Timothy Pettway caused the death of Christopher Mitchell.

2. The Petitioner's VI Amendment rights were violated were [sic] the Defendant was jailed eleven (11) months in lieu of bail before trial commenced. The Petitioner did not waive his speedy trial rights.

3. The indictment was defective when it failed to include deadly weapon/dangerous ordinance, to wit: baseball bat, as the murder weapon. Dr. McCollom of the Coroner's Office testified that the cause of death was blunt impacts to the head with skull and brain injuries. The prosecution asserted the victim was murdered with a baseball bat, but failed to include such specifications and allegation in the indictment.

4. The use of defendants (or co-defendants) as witnesses is a practice never authorized by Article III Section 2 Clause 3 or the 6th Amendment, U.S. Constitution, in trial by jury. The Petitioner's conviction rested entirely upon the testimony of (co-defendant) Joseph McGowan, whom should have been disqualified as a witness. Co-Defendant Joseph McGowan was the target of bribery by the prosecutor when he accepted a plea bargain of 25 years to Life, evading the death penalty in exchange for perjured testimony against the Defendant Timothy Pettway.

5. Petitioner was denied the right to due process in accordance with Crim. R. 5(B). Petitioner was arrested June 28, 2007 and remained in the custody of the Cuyahoga County Sheriff. On July 10, 2007, Petitioner was indicted. Petitioner was indicted Twelve (12) days after arrest and Crim. R. 5(B) states a defendant in custody shall have a preliminary hearing no later than 10 consecutive days following arrest. However if Defendant is indicted a preliminary hearing shall not be held. Notwithstanding the preliminary hearing, the State failed to indict the defendant within the provisions of its own time limitations, where defendant did not waive his rights.

6. The Petitioner's conviction was based off of the testimony of co-defendant Joseph McGowan, whom is a psychiatric patient. Evid. R. 601 states in part,

9

one whom is of unsound mind shall not be called as a witness the record shall confirm. Coupled with Mr. McGowan's own admission, prior to and during the time of trial, Mr. McGowan suffered from delusion and hallucinations in which he was being treated for. McGowan has been suffering from this illness since the age of 14. The trial court erred in allowing the testimony of a witness of unsound mind. More so, from basing the Petitioner's conviction on the testimony of an accomplice witness.

(Doc. 8-1, Ex. 9). The State filed a brief in opposition. (Doc. 8-1, Ex. 10). Over two and a half years later, on November 10, 2011, Pettway filed a motion for leave to amend his post-conviction petition (Doc. 8-1, Ex. 11), to include seven additional errors[3]:

1. The State's key and only "eyewitness" to testify at trial was (co-defendant) Joseph McGowan, who now recants his testimony. The Petitioner's conviction was based on the perjured testimony of McGowan who originally claimed to have witnessed the Petitioner assault the victim. However, McGowan now submits an affidavit recanting his trial testimony as it relates to the purported actions of Timothy Pettway.

2. Petitioner assigns herein that trial counsel was ineffective and that by adopting an affirmative defense, to wit: self-defense, and then failing to call for the Defendant to testify in his own defense.

3. Counsel was ineffective by failing to request that the trial court issue jury instructions of Manslaughter.

4. Violation of Defendant's constitutional right to due process of law when he was denied his entitled preliminary hearing within the statutory ten day period after arrest. O.R.C. § 2945.71(C)(1) provides that a person against whom a felony charge is pending shall be accorded a preliminary hearing within 10 days after his arrest if he is held in jail. Petitioner insists that the Court's failure to abide by the rule divests it and subsequent courts of jurisdiction to continue with the case, making his conviction void ab initio. Petitioner contends that there was no indictment returned whereby invalidating any constitutional necessity for a preliminary hearing and within the specified time frame as set forth by law.

5. Petitioner assigns herein that the trial court erred when instructing the jury outside the scope of CR 421.19 pursuant to the Ohio Jury Instructions Criminal Handbook, as it relates to self-defense.

---

3. The claims were misnumbered in the petition as there was no Fourth claim. The numbers have been corrected herein.

6. Petitioner herein assigns that trial counsel was ineffective for failing to motion for a mistrial when the jury was deadlocked as to the charged offense in Count One but move to find the Defendant guilty of the lesser included offense under Count One.

7. Since there was no amendment to the indictment deleting the death penalty specification, a single trial judge lacked authority to sentence the Defendant.

(Doc. 8-1, Ex. 12). The State filed a brief in opposition, noting the petition was both untimely as well as barred by *res judicata*. (Doc. 8-1, Ex. 13). Petitioner replied. (Doc. 8-1, Ex. 14). On November 2, 2012 the Court issued its Findings of Fact and Conclusions of Law, denying Petitioner's petitions for post-conviction relief as "barred by *res judicata* and… otherwise without merit." (Doc. 8-1, Ex. 15).

Petitioner, *pro se*, filed a timely notice of appeal of this decision in the Eighth District Court of Appeals, Cuyahoga County, Ohio. (Doc. 8-1, Ex. 16). In his brief, he raised the following assignments of error:

1. The trial court erred in denying Appellant's motion for trial without an evidentiary hearing.

2. Trial counsel was ineffective and that by adopting an affirmative defense (self defense), and then failing to call forth the Appellant to testify in his own defense.

3. Trial counsel was ineffective by failing to request that the trial court issue jury instruction of manslaughter.

4. Appellant's sixth amendment rights were violated where he was jailed for eleven (11) months in lieu of bail before the commencement of trial and the Defendant never waived his rights to a speedy trial.

5. Appellant's constitutional right to due process was violated when he was denied his initial preliminary hearing within the statutory ten day period pursuant to O.R.C. 2945.71(C)(1).

6. The trial counsel erred when instructing the jury outside the scope of CR 421.19 pursuant to the Ohio jury instructions criminal handbook, as it relates to self defense.

7. Trial counsel was ineffective for failing to motion for mistrial when the jury was deadlocked as to the charged offense in count one but moved on to find the Defendant guilty of the lesser included offense under count one.

8. The trial court erred where a single judge lacked the authority to sentence the Defendant in a capital case where there was no amendment to the indictment deleting the death penalty specification.

(Doc. 8-1, Ex. 17). The State of Ohio filed a brief in response on January 14, 2013. (Doc. 8-1, Ex. 18). The appellate court, *sua sponte* dismissed the case on January 11, 2013, for failing to file the record. (Doc. 8-1, Ex. 19). Subsequently, the Eighth District Court of Appeals reinstated the case upon Petitioner's motion, and he filed a reply to the State's brief. (Doc. 8-1, Ex. 20). On June 20, 2013, the court of appeals affirmed the trial court's denial of his post-conviction petition without a hearing, as all claims were barred by *res judicata*. (Doc. 8-1, Ex. 21).

On August 5, 2013, Pettway appealed this decision to the Supreme Court of Ohio. (Doc. 8-1, Ex. 22). In his memorandum in support of jurisdiction Petitioner repeated his eight claims as propositions of law. (Doc. 8-1, Ex. 23). The State filed a waiver of memorandum in response. On November 20, 2013, the Supreme Court of Ohio declined jurisdiction and dismissed the appeal. (Doc. 8-1, Ex. 24).

*Motion for New Trial*

Meanwhile, on March 10, 2009, Petitioner, *pro se*, filed a motion for new trial claiming his co-defendant recanted his trial testimony. (Doc. 8-1, Ex. 25). The Court denied the motion in an entry filed March 13, 2012. (Doc. 8-1, Ex. 26). Pettway failed to perfect a timely appeal of this decision.

*Second Post-Conviction Petition*

On July 9, 2010, Petitioner filed a *pro se* motion to vacate void judgment and order new sentencing hearing arguing that the crime he was convicted of is not eligible for post-release control, and thus, his sentence was void and must be vacated. (Doc. 8-1, Ex. 27). The State filed

12

a brief in opposition (Doc. 8-1, Ex. 28) to which Petitioner replied. (Doc. 8-1, Ex. 29). On January 18, 2011, the Court issued a decision denying the petition. (Doc. 8-1, Ex. 30). Petitioner did not perfect a timely appeal of this decision.

Rather on June 5, 2012, Petitioner, *pro se*, filed a motion for leave to file a delayed appeal and notice of appeal in the Eighth District Court of Appeals, Cuyahoga County, Ohio of the denials of his motions for new trial and petition to vacate the sentencing entry. (Doc. 8-1, Exs. 31-32). The appellate court denied his motion to file a delayed appeal and dismissed the appeal on June 25, 2012. (Doc. 8-1, Ex. 33). Petitioner's motion for reconsideration pursuant to App. R. 26(A) on was denied on July 10, 2012. (Doc. 8-1, Exs. 32-33).

On July 26, 2012, Petitioner, *pro se*, filed a notice of appeal with the Supreme Court of Ohio in Case No. 2012-1214. (Doc. 8-1, Ex. 36). In his memorandum in support of jurisdiction he asserted the following proposition of law:

1. The appeals court erred in denying the appellant's motion for new trial.

(Doc. 8-1, Ex. 37). The Supreme Court of Ohio denied leave to appeal the question and dismissed the appeal as "not involving any substantial constitutional question." (Doc. 8-1, Ex. 38).

*Appellate Rule 26(B) Application to Reopen Appeal*

On December 16, 2009, Petitioner, *pro se*, filed an untimely application for reopening pursuant to App. R. 26(B) asserting several claims of ineffective appellate counsel. (Doc. 8-1, Ex. 19). On January 22, 2010, the appellate court denied the application as untimely filed. (Doc. 8-1, Ex. 40). Petitioner's application for reconsideration (Doc. 8-1, Ex. 41) was denied in an entry filed February 16, 2010. (Doc. 8-1, Ex. 42). Petitioner did not appeal any of these decisions.

*Third Post-Conviction Petition*

On April 12, 2012, Petitioner, *pro se*, filed another post-conviction petition to vacate void judgment asserting the following claims of ineffective assistance of trial counsel:

1. Petitioner assigns herein that trial counsel was ineffective and that by adopting an affirmative defense, to wit: self-defense, and then failing to call forth the Defendant to testify in his own defense.

2. Counsel was ineffective by failing to request that the trial court issue jury instruction of manslaughter.

3. Counsel was ineffective for failing to object where, Petitioner's Sixth Amendment rights have been violated where he was jailed for a period of eleven (11) months in lieu of bail before the commencement of trial and the Defendant never waived his rights to a speedy trial.

4. Petitioner assigns herein that trial counsel was ineffective for failing to object to the error of the trial court when he instructed the jury outside the scope of CR 421.19, pursuant to the Ohio jury instructions criminal handbook, as it relates to the law on self defense.

5. Petitioner herein assigns that trial counsel was ineffective for failing to motion for a mistrial when the jury was deadlocked as to the charged offense in count one but moved on to find the defendant guilty of the lesser included offense under count one.

(Doc. 8-1, Ex. 43). The State filed an opposition. (Doc. 8-1, Ex. 44). The Court denied the motion to vacate on April 16, 2012. (Doc. 8-1, Ex. 45).

Petitioner appealed the trial court's decision to the Eighth District Court of Appeals. (Doc. 8-1, Ex. 46). On July 10, 2012, the appellate court *sua sponte* dismissed the appeal for failure to file the record. (Doc. 8-1, Ex. 47). Pettway did not seek further appellate review.

*Fourth Post-Conviction Petition*

Undaunted, on July 19, 2012, Petitioner, filed yet another *pro se* motion to vacate void judgment alleging ineffective assistance of counsel due to the advice of counsel during the plea bargaining process. (Doc. 8-1, Ex. 48). The Court denied the motion to vacate on December 19, 2012. (Doc. 8-1, Ex. 49).

14

On January 18, 2013, Petitioner appealed the trial court's decision to the Eighth District Court of Appeals. (Doc. 8-1, Ex. 50). In his brief, he raised a sole assignment of error:

1. The trial court erred in denying Appellant's motion to vacate void judgment pursuant to *Lafler v. Cooper*, 2012 U.S. LEXIS 2322.

(Doc. 8-1, Ex. 51). Once again, the appellate court dismissed Pettway's appeal due to his failure to file the record pursuant to App. R. 3(A), 10(A) and Local App. R. 10. (Doc. 8-1, Ex. 52).

On April 17, 2013, Petitioner, *pro se*, filed a notice of appeal with the Supreme Court of Ohio. (Doc. 8-1, Ex. 53). In his memorandum in support of jurisdiction he set forth one proposition of law:

1. The trial court erred in denying Appellant's motion to vacate void judgment pursuant to *Lafler v. Cooper*, 2012 U.S. LEXIS 2322.

(Doc. 8-1, Ex. 54). The State filed a waiver of memorandum in response. On July 24, 2013, the Supreme Court of Ohio declined to accept jurisdiction and dismissed the appeal. (Doc. 8-1, Ex. 55).

## FEDERAL HABEAS CORPUS

On March 14, 2014, Petitioner timely filed the instant Petition for a writ of habeas corpus raising the following grounds for relief:

Ground One (Fourteenth Amendment): Petitioner filed a petition for post-conviction relief and also sought a new trial. Petitioner presented substantial evidence in support of his motion for a new trial but he was denied the motion without a hearing which denied him due process of law.

Ground Two (Sixth Amendment): Petitioner was denied effective assistance of trial counsel because trial counsel informed the jury that this was a case of self-defense but failed to call any supporting witnesses to support self-defense.

Ground Three (Sixth and Fourteenth Amendment: Petitioner was denied a fair trial and also ineffective assistance of counsel when the trial court failed to instruct the jury on manslaughter where the evidence supported a manslaughter instruction.

Ground Four (Sixth and Fourteenth Amendment): Petitioner was denied his rights to a speedy trial where he was held in jail without being released for

15

eleven (11) months before the trial commenced and there was no waiver of his right to a speedy trial.

Ground Five (Sixth and Fourteenth Amendment): Petitioner was denied his constitutional rights where he was not afforded a preliminary hearing within the statutory period of (10) days under Ohio law but was held for almost eleven (11) months in jail without a hearing.

Ground Six (Fourteenth Amendment): Petitioner was denied a fair trial when the court failed to inform the jury properly concerning his right to self-defense.

Ground Seven (Sixth Amendment): Petitioner was denied effective assistance of counsel when counsel failed to request a mistrial where after the jury informed the court that it was deadlocked, the court urged the jury to move on to consider the lesser offense of murder instead of discharging the jury.

Ground Eight (Fourteenth Amendment): Petitioner was denied due process of law when a single judge sentenced petitioner for a capital offense where the indictment was not amended [so] as to delete the death penalty specifications.

(Doc. 1).

## JURISDICTIONAL ISSUES

Respondent argues grounds two through eight of the Petition should be dismissed as procedurally defaulted. (Doc. 8, at 17).

### *Procedural Default*

Procedural default occurs when a petitioner fails to fairly present his claims in a federal constitutional context to the highest state court. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Anderson v. Harless*, 459 U.S. 4 (1982). Reasons of federalism and comity generally bar federal habeas corpus review of "contentions of federal law . . . not resolved on the merits in the state proceeding due to [the petitioner's] failure to raise them there as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977); *Lundgren v. Mitchell*, 440 F.3d 754 (6th Cir. 2006). In Ohio, "one complete round of the State's established appellate review process" means a defendant must fairly present his constitutional claims, on the record, to the trial court, the court of appeals, and the Supreme Court of Ohio on direct appeal. *Caver v. Straub*, 349 F.3d.

16

340, 346 (6th Cir. 2003)(quoting *O'Sullivan*, 526 U.S. at 845).  The exhaustion requirement is satisfied if it is clear that the claims are procedurally barred under state law. *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

A habeas petitioner may fail to obtain consideration of a claim by a state court in two scenarios, either: (1) he failed to fairly raise the claim before the state courts while state remedies are still available, or (2) he failed to comply with a state procedural rule which prevented the state courts from reaching the merits of the petitioner's claim. *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977). In either of these scenarios, the claim is procedurally defaulted and may not be considered by the federal court on habeas review. *Seymour v. Walker*, 224 F.2d 542, 550 (6th Cir. 2000).

If the state argues a petitioner has procedurally defaulted his claims, the court must conduct a four-step analysis to determine whether the petitioner has indeed defaulted and, if so, whether the procedural default may be excused:

1.  The Court determines whether there is a procedural rule applicable to the claim at issue, and whether the petitioner in fact failed to follow it;

2.  The Court then determines whether the state courts actually enforced their procedural sanction;

3.  The Court then decides whether the state's procedural forfeit is an "adequate and independent ground" on which the state can rely to foreclose federal review; and

4.  Finally, in order to avoid default, the petitioner can demonstrate that there was "cause" for him to neglect the procedural rule, and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Demonstrating "cause" requires a petitioner to "show that 'some objective factor external to the defense' prevented the petitioner's compliance with a state procedural rule."  *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 488

17

(1986)). Demonstrating prejudice requires a petitioner to show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *U.S. v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Grounds Two through Eight

Petitioner initially raised grounds two through eight of his Petition in his first post-conviction petition and its accompanying amendment. *Supra* pg. 9-11; (Doc. 8-1, Exs. 9 & 12). Fair presentation requires that the claims be presented at the first available opportunity, *Rust v. Zent*, 17 F3d 155, 160-61 (6th Cir. 1994), so as to allow the state court a full opportunity to resolve any constitutional issues. *Caver*, 349 F.3d at 346. Accordingly, if all the facts necessary to develop a claim were available on direct appeal, then that claim, and any other discoverable claim, must be presented on direct appeal. *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001). The failure to do so will result in a waiver of those claims under *res judicata*. *Id*.; *State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982).

Petitioner did not present grounds two through eight in his direct appeal to the Eighth District despite the fact that the basis of these claims were known or discoverable to Petitioner at the time of his filing his direct appeal. *Supra* pg. 8; (Doc. 8-1, Ex. 6). As such, when Petitioner attempted to raise these grounds for relief in his first post-conviction petition, the Court of Appeals explicitly denied his petition based on *res judicata* because the claims should have been litigated on direct appeal. (Doc. 8-1, Ex. 21 at ¶¶ 10-15). Although Petitioner appealed, the Supreme Court of Ohio issued a summary dismissal which this Court presumes was based upon the same procedural bar. *Simpson v. Sparkman,* 94 F.3d 199, 203 (6th Cir. 1996)("Where a state court is entirely silent as to its reasons for denying requested relief, we assume that the state court would have enforced any applicable procedural bar."). Thus, the first two prongs of the

18

*Maupin* standard are satisfied: Petitioner did not raise known issues in his direct appeal contrary to the doctrine of *res judicata* and the state court subsequently declined to review the merits of these claims due to his failure.

*Res judicata* has long been held to be a state procedural bar with the effect that claims raised for the first time in a post-conviction proceeding will be dismissed. *See State v. Perry*, 226 N.E.2d 104 (Ohio 1967). *Res judicata* is a "firmly established and regularly followed" state practice on which to foreclose federal review of a constitutional claim. *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *see also Buell*, 247 F.3d 337. Thus, the third prong of the *Maupin* standard, adequacy and independence, is satisfied. *See Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004).

Therefore, due to Petitioner's procedural default on grounds two through eight the Court is foreclosed from reviewing their merits unless he can demonstrate some external factor as cause for the default and resulting prejudice. *Murray*, 477 U.S. at 488. Petitioner has failed to allege any cause for the default but instead has relied on claims of actual innocence to overcome his default.

### *Actual Innocence*

A procedural default may be excused if the petitioner demonstrates that not excusing the default "will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The Supreme Court has held that such an inquiry requires a petitioner to "supplement[] a constitutional claim with a 'colorable showing of factual innocence.'" *Id.* at 495 (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986)). However, it is not enough to show legal insufficiency, the petitioner must show actual innocence. *Bousley v. United States*, 523 U.S. 614, 623 (1998); *see also Carter v. Mitchell*, 443 F.3d 517, 538 (6th Cir. 2006). The standard

19

does not require absolute certainty in regard to petitioner's guilt or innocence. *McSwain v Davis*, 287 F.App'x 450, 458-59 (6th Cir. 2008).

Rather, to demonstrate "actual innocence" a petitioner must prove that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in the light of the new evidence. *Schlup*, 513 U.S. 298. Maintaining this exception to the rule against reviewing procedurally defaulted claims serves as "an additional safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty". *Id.* (quoting *Stone v. Powell*, 428 U.S. 465, 492–93 (1976)). But, "[t]he *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327). Actual innocence, if proven, is only a "gateway" that allows courts to reach the merits of other claims that would otherwise be time-barred or defaulted. *Schlup,* 513 U.S. at 316. Importantly, it should be noted that the Sixth Circuit has not recognized a free-standing actual innocence claim. *D'Ambrosio v. Bagley*, 527 F.3d 489, 498 n.6 (6th Cir. 2008).

The miscarriage of justice standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the standard unless he persuades the district court that in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. *McCray v. Vasbinder*, 499 F.3d 568, 571-72 (6th Cir. 2007) (quotations omitted); *see also Souter v. Jones*, 395 F.3d 577, 602 (6th Cir. 2005). The petitioner must present new evidence of innocence that is so strong a reviewing court cannot have confidence in the outcome of the trial. *Schlup*, 513 U.S. at 327. New, reliable evidence may be "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id.* at 324.

Petitioner's claim of actual innocence is based on Joseph McGowan's recantation of his trial testimony in an affidavit. (Doc.8-1, Ex. 11). In this affidavit, McGowan stated he was the only one who hit the victim with a baseball bat and he was not encouraged, but was actually told to stop, by Petitioner. (Doc. 8-1, Ex. 11). McGowan stated he hit the victim with the bat after Petitioner had shot the victim because he was trying to protect Petitioner. (Doc. 8-1, Ex. 11). Petitioner alleges that had McGowan testified truthfully at the trial, no reasonable juror could have found him guilty beyond a reasonable doubt. (Doc. 9, at 3-7). The Court disagrees.

First, recanting witnesses are viewed with extreme suspicion. *McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007). Recantation "upsets society's interest in finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Carter v. Mitchell*, 443 F.3d 517, 539 (6th Cir. 2006) (citing *Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34 (1984)). Second, Petitioner asserted McGowan suffers from psychiatric conditions which render him unsound; therefore, his subsequent recantation is additionally suspect. (*See* Doc. 8-1, Ex. 9). Even taking McGowan's version of the events in his affidavit as true, it does not substantially change the evidence presented at trial: Petitioner still shot the victim; the gunshot was still a potential cause of the victim's death; and Petitioner's post-incident conduct, such as collecting his possessions after the incident, changing his bloody clothes, disposing of the gun, and not reporting the incident to the police, remain unchanged.

Taking into account the suspect nature of recanted testimony coupled with the other available unchanged evidence related to the crime, the Court finds Petitioner has not carried his burden. While McGowan's testimony could have undermined the State's case, the Court finds a reasonable juror could still have found Petitioner guilty beyond a reasonable doubt.  This "new" evidence, especially considering its veracity, was not more likely than not to change the jurors'

decision. As Petitioner has not persuaded the Court of the existence of actual innocence, the Court cannot reach the merits of his procedurally defaulted grounds for relief.

***Non-Cognizable Claims***

The Court will not have jurisdiction over Petitioner's claims for purposes of habeas corpus review if they do not "challenge the legality of his custody" based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254. Indeed, "[t]he writ of habeas corpus is not available to remedy errors of only state law." *Smith v. Morgan*, 371 F. App'x 575, 582 (6th Cir. 2010) (citing 28 U.S.C. § 2254(a)); *see also Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("[a] claim based solely on an error of state law is not redressable through the federal habeas process.") (quoting *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)). Importantly, merely asserting a state law error violates the Federal Constitution is not sufficient to justify jurisdiction. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010).

Nevertheless, habeas relief may be available if an alleged error of state law subjected the petitioner to a "fundamentally unfair" criminal process. *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006). "[T]he category of infractions that violate fundamental fairness is defined very narrowly", and includes only state rulings that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1977) (citations omitted)); *see also Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993). The habeas petitioner bears the burden to show "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental. *Bey*, 500 F.3d at 521.

Here, Petitioner has alleged a non-cognizable claim for relief at ground one. He asserts the state's failure to grant him a hearing on his motion for new trial and post-conviction petition was a violation of his due process rights. However, this claim does not dispute his underlying

conviction or detention, and is thus, non-cognizable. *Kirby v. Dutton*, 794 F.2d 245, 247-48, (6th Cir. 1986)(holding a habeas claim "must directly dispute the fact or duration of the confinement."). Furthermore, "habeas corpus is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction proceedings." *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001); *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007). In fact, rulings by state courts with respect to state law are binding on the federal courts. *Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). Thus, even if Petitioner were correct in asserting that the state court erred in its review of his petition and motion for a new trial, it is not reviewable in this forum. *See Cress*, 484 F.3d at 853.

Furthermore, Petitioner does not challenge the fundamental fairness of his criminal process such that the Court could extend review to his ground for relief. Even so, Petitioner has not borne the burden of proving what, if any, fundamental principle was violated by the state court's denial of his post-conviction petition. *See Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007). Thus, ground one should be dismissed as non-cognizable.

## CONCLUSION

Following review, and for the reasons stated above, the Court recommends the Petition be dismissed.

 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).